UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ERIC and LAURIE CASPER, DIAMOND ACRES TRUST, GRAND RIVER COOPERATIVE GRAZING ASSOCIATION, ROBERT and CONNIE HERMANN, RYAN HERMANN, JAMIE HERMANN, ROGER SONN, DARCI D. FEIFER LIMITED PARTNERSHIP, DAVID and LORI BOSSMAN, GENERAL PARTNERS, VINCENT and SUSAN GUNN, DUANE MEINK, KEN KRISLE, LARRY ARCHIBALD, KATHY ARCHIBALD, RYAN ARCHIBALD, STEPHANIE ARCHIBALD, GAYLE EVRIDGE, LINDA EVRIDGE, LAVONNE FOSS, RICHARD FOSS, DUANE HARRIS, DAWN HARRIS and ALBERT KELLER, <br><br>           Plaintiffs, <br><br>     vs. <br><br> UNITED STATES OF AMERICA, <br><br>           Defendant. | CIV. 15-5087-JLV <br><br><br><br> ORDER |

Plaintiffs initiated this action against defendant United States seeking recovery under the Federal Tort Claims Act ("FTCA"). (Docket 1). In April 2013, employees of the government in the United States Forest Service ("Forest Service") carried out a prescribed burn in the Dakota Prairie National Grasslands in South Dakota. Id. at pp. 1-2. The prescribed burn became an escaped

wildfire that plaintiffs claim damaged their property.   Id. at p. 2.   The government filed a motion to dismiss this case because it believes the court lacks subject matter jurisdiction.   (Docket 16).   Plaintiffs pursued administrative remedies as the FTCA requires.   (Docket 1 at p. 3).

## BACKGROUND

Through the Forest Service, the government manages millions of acres of National Forests and Grasslands.   Forest Management, U.S. Forest Service, available at https://www.fs.fed.us/forestmanagement/index.shtml.   The Dakota Prairie Grasslands span North Dakota and South Dakota.   (Docket 17 at p. 3).   Within the Dakota Prairie Grasslands is the Grand River National Grassland, comprised of approximately 155,000 acres in northwestern South Dakota.   Id.

To manage lands like the Dakota Prairie Grasslands, the Forest Service creates land and resource management plans ("management plans") for a variety of purposes, including promoting the ecological integrity of the land.   See 36 C.F.R. § 219.1(c).[1]   The Forest Service developed a management plan for the Dakota Prairie Grasslands in 1986 and revised it in 2001.   (Docket 17 at p. 3).

---

[1]Additional purposes include managing lands "so that they are ecologically sustainable and contribute to social and economic sustainability; consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities; and have the capacity to provide people and communities with ecosystem services and multiple uses that provide a range of social, economic, and ecological benefits for the present and into the future.   These benefits include clean air and water; habitat for fish, wildlife, and plant communities; and opportunities for recreational, spiritual, educational, and cultural benefits."   Id.

The plan covers the use of prescribed burns[2] to manage lands.   See Docket 18-1.   It defines "prescribed burning" as the "[c]ontrolled application of fire to wild land fuels[3] in either their natural or modified state, under specified environmental conditions, that allows the fire to be confined to a predetermined area and, at the same time, to produce the fire line intensity and rate of spread required to attain planned resource management objectives."   Id. at p. 218.

The Forest Service manual generally guides the application of a prescribed burn.   (Docket 17 at p. 4).   On a more specific level, the Interagency Prescribed Fire Planning and Implementation Guide ("prescribed fire guide")[4] "provides standardized procedures, specifically associated with the planning and implementation of prescribed fire."   (Docket 18-5 at p. 3).   The prescribed fire guide requires the creation of a prescribed fire plan ("fire plan" or "burn plan") detailing the procedure for implementing a prescribed burn.   Id. at p. 19.

During 2012 and 2013, Forest Service employees prepared a burn plan for the Dakota Prairie Grasslands based on the prescribed fire guide.   (Docket 18 at pp. 6-7).   Three aspects of the prescribed fire guide's requirements for burn plans are relevant to this case.   The first is the requirement that a burn plan "at

---

[2]"Prescribed burn" and "prescribed fire" mean the same thing here.

[3]"Fuels" can refer to grasses, needles, leaves, twigs, branches or logs.   See generally Kelsi Bracmort, Wildfire Fuels and Fuel Reduction, Congressional Research Service (Dec. 17, 2013).

[4]The prescribed fire guide is the product of several offices within the Department of the Interior and Department of Agriculture: the Bureau of Indian Affairs, Bureau of Land Management, National Park Service, Fish and Wildlife Service and Forest Service.   (Docket 18-5 at p. 3).

a minimum specify the weather (forecast and observed), fire behavior and fuels information and smoke dispersal monitoring required during all phases of the project and the procedures for acquiring it, including who and when."   (Docket 18-5 at p. 26).   To satisfy this provision, the Forest Service's burn plan states, "Fuels Information (forecast and observed) required and Procedures: National Fire Danger Rating System (NFDRS) indices from the Tatanka Prairie Remote Automated Weather Station (RAWS) will be used for current fuels information." (Docket 18-6 at p. 14).

Second, the prescribed fire guide requires the burn boss, the Forest Service employee leading the prescribed burn, to complete a checklist in order to proceed with the prescribed burn.   (Docket 18-5 at p. 19).   The prescribed fire guide includes a template checklist requiring the burn boss to indicate whether "the burn unit experienced unusual drought conditions or contain[s] above normal fuel loadings which were not considered in the prescription development[.]"   Id. at p. 36.   The Dakota Prairie Grasslands burn plan used this checklist template.   (Docket 18-6 at p. 3).   Nicole Bresnahan, the burn boss, checked "NO" to certify no unusual drought conditions or above normal fuel loadings and proceeded with the rest of the checklist.   Id.

And third, the prescribed fire guide requires the burn plan to set forth its strategy for preventing the fire from leaving its predetermined area.   (Docket 18-5 at pp. 22, 24).   This is called the holding plan, and it is "used for operations to maintain the fire within the project area and meet project objectives until the

4

fire is declared out." Id. at p. 24.   Holding plans "must be developed with the consideration of the predicted fire behavior outside the project boundary(s). Fire behavior characteristics for fuel models within the maximum spotting distance and/or adjacent to the project boundaries must be considered and modeled. These predictions must be modeled using fire behavior model runs or empirical evidence of the hottest, driest, and windiest prescription limits identified in the Prescribed Fire Plan, along with the most extreme environmental conditions (slope, aspect) identified." Id. at p. 22.   If the Forest Service uses "reference modeling outputs or worksheets[,]" it must attach them to the burn plan "to justify minimum holding resources required." Id. at p. 24.   In developing the Dakota Prairie Grasslands burn plan based on the prescribed fire guide, the Forest Service specified holding resources it found "justified by the modeling of the 'hottest, driest, and windiest' prescription limits of the burn plan in the BEHAVE/CONTAIN analysis." (Docket 42 at p. 7).

Part of the government's holding plan relates to Forest Service materials beyond the prescribed fire guide.   The government creates regional manuals setting Forest Service policy. (Docket 33 at p. 32).   The Northern Region of the Forest Service includes the Dakota Prairie Grasslands. Id.   The Forest Service's holding plan states four fire engines known as type 6 engines will be used to contain the fire. (Docket 42 at p. 6).   The Northern Region's manual ("regional manual") provides that type 6 engines "are approved for use in the . . . Northern Region[, and] must have a tank capacity of 300 gallons, be equipped

with an approved foam concentrate metering system, and be staffed by a 3-person effective crew, 7 days per week." (Docket 42-1 at p. 2).

The Forest Service ignited the prescribed burn in the Dakota Prairie Grasslands on April 3, 2013. (Docket 17 at p. 2). The fire escaped the Forest Service's holding lines and became a wildfire that burned 3,519 acres of federal land and 7,160 acres of private land, totaling 10,679 acres. Id. The Forest Service declared the fire controlled on April 7, 2013. Id. at p. 12. Plaintiffs allege they owned or leased property damaged by the escaped fire. (Docket 1 at p. 2). They claim the damaged property included grassland and crops along with materials used to raise cattle and manage soil conditions. Id.

## ANALYSIS

### I. LEGAL FRAMEWORK

Unless the United States government consents, it is immune from suit. Hart v. United States, 630 F.3d 1085, 1088 (8th Cir. 2011). "Congress waived the sovereign immunity of the United States by enacting the FTCA, under which the federal government is liable for certain torts its agents commit in the course of their employment." Id. But Congress did not waive sovereign immunity for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This is called the discretionary function exception; it is an exception to the FTCA's sovereign immunity waiver. If the discretionary function

6

exception applies, sovereign immunity blocks the suit and the court lacks subject matter jurisdiction.   Compart's Boar Store, Inc. v. United States, 829 F.3d 600, 604 (8th Cir. 2016).   When the exception does not apply, the United States government consents to be sued in tort "in the same manner and to the same extent as a private individual under like circumstances."   28 U.S.C. § 2674.

"A well-established legal framework applies to determine whether the discretionary function exception bars a party's suit under the FTCA."   Herden v. United States, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc).   First, the court determines "whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being 'controlled by mandatory statutes or regulations.' "   Id. (quoting United States v. Gaubert, 499 U.S. 315, 328 (1991)).   "If the challenged conduct is not discretionary," the agent is stripped of discretion because a statute or regulation mandates specific action, "the exception does not apply."   Id. at 1046-47.

But if the conduct at issue involves discretion, the court proceeds to step two of the framework and decides "whether the government employee's judgment or choice was 'based on considerations of social, economic, and political policy.' " Id. at 1047 (quoting Layton v. United States, 984 F.2d 1496, 1499 (8th Cir. 1993)).   "Not all discretionary decisions are immune from suit because the Congressional purpose of the exception is 'to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and

7

political policy[.]' " Id. (quoting United States v. Varig Airlines, 467 U.S. 797, 814 (1984)) (internal quotation marks omitted).   It does not matter "whether or not [a] defendant in fact engaged in conscious policy-balancing[,]" C.R.S. ex rel. D.B.S. v. United States, 11 F.3d 791, 801 (8th Cir. 1993), as long as the "discretionary decision is 'susceptible to policy analysis . . . .' " Herden, 726 F.3d at 1047 (quoting Gaubert, 499 U.S. at 325).   "When the first step is satisfied, [courts] presume that the governmental action involved considerations of public policy[, and i]t is the plaintiff's burden to rebut that presumption." Compart's Boar Store, 829 F.3d at 605.

In determining whether the discretionary function exception applies, the court engages in a narrow inquiry.   Whether the government's conduct was in fact negligent is not part of the analysis.   Layton, 984 F.2d at 1502 ("Whether these employees were negligent in making any of these decisions is irrelevant."). "[N]egligence is simply irrelevant to the discretionary function inquiry. . . . [I]f the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability." Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1029 (9th Cir. 1989).   "The statute makes clear that where there is discretion, the government has not waived its sovereign immunity 'whether or not the discretion involved [is] abused.' " Gonzalez v. United States, 814 F.3d 1022, 1034 n.4 (9th Cir. 2016) (quoting 28 U.S.C. § 2680(a)); see Autery v. United States, 992 F.2d 1523, 1528 (11th Cir. 1993) (making the same point).

8

"To determine . . . jurisdiction, [the court] may look outside the pleadings." Compart's Boar Store, 829 F.3d at 604.   Although plaintiffs shoulder "the burden of proving subject matter jurisdiction[,]" id., United States Courts of Appeals are divided on which party has the burden in a discretionary function analysis.   Hart, 630 F.3d at 1089 n.3 ("Our sister circuit courts of appeals are divided on the burden-of-proof issue.").   Without answering this issue for United States District Courts, the United States Court of Appeals for the Eighth Circuit elaborated on it by noting the following four observations.   First, the Eighth Circuit has "repeated the general rule that [t]he burden of proving federal jurisdiction . . . is on the party seeking to establish it, and this burden may not be shifted to the other party."   Hart, 630 F.3d at 1089 n.3 (citing Great Rivers Habitat All. v. FEMA, 615 F.3d 985, 988 (8th Cir. 2010)) (internal quotation marks omitted).   Second, the Eighth Circuit has "applied [that] principle in an FTCA case . . . ."   Id.   Third, the Eighth Circuit "stated, in conjunction with the second part of the discretionary-function-exception test, 'it is [the plaintiff], not the United States, who must assert facts that show the decision was not based on policy considerations . . . .'"   Id. (quoting Dykstra v. U.S. Bureau of Prisons, 140 F.3d 791, 796 (8th Cir. 1998)).   And fourth, the Eighth Circuit has "affirmed a district court's decision placing the burden upon the plaintiff . . . ."   Id. (citing Bacon v. United States, 661 F. Supp. 8, 10 (E.D. Mo. 1986), aff'd, 810 F.2d 827 (8th Cir. 1987)).

Turning to the substance of the discretionary function exception, the court must identify the precise conduct plaintiffs target.   "In order to determine whether an official's conduct was discretionary, [the court] must first define that conduct."   <u>Gonzalez v. United States</u>, 851 F.3d 538, 545 (5th Cir. 2017); <u>Young v. United States</u>, 769 F.3d 1047, 1054 (9th Cir. 2014) ("Our cases make clear that when determining whether the discretionary function exception applies in a particular case, the question of how the government is alleged to have been negligent is critical.") (internal quotation marks omitted); <u>Autery</u>, 992 F.2d at 1527 ("Before we address whether the government's conduct violated a mandatory regulation or policy, we must determine exactly what conduct is at issue.").   "[E]ach separate action must be examined to determine whether the specific actor had discretion of a type Congress intended to shield."   <u>In re Glacier Bay</u>, 71 F.3d 1447, 1451 (9th Cir. 1995).   However, courts "should not parse the case too finely and lose sight of the big picture."   <u>Kimball v. United States</u>, No. 1:12-CV-00108, 2014 WL 683702, at *5 (D. Idaho Feb. 20, 2014).

## II.  APPLYING THE EXCEPTION

Plaintiffs' brief indicates they challenge four instances of the government's conduct.   (Docket 33).   First, plaintiffs seek to hold the government liable for Forest Service employees not obtaining fuels information from the Tatanka Prairie Remote Automated Weather Station ("the Tatanka Station").   <u>Id.</u> at p. 9. Second, plaintiffs target the government's actions in finding no unusual drought conditions existed when starting the prescribed burn.   <u>Id.</u>   Third, plaintiffs take

10

issue with the government's justification for its plan to prevent the fire from burning beyond the planned area.   Id.   And fourth, plaintiffs challenge the Forest Service's assignment of people to fire engines dedicated to controlling the fire.   Id. at p. 32-35.   The court examines whether any of this conduct meets the discretionary function exception.

### a.   STEP ONE: IS THERE DISCRETION?

As explained above, the first step of the analysis asks "whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being 'controlled by mandatory statutes or regulations.' "   Herden, 726 F.3d at 1046 (quoting Gaubert, 499 U.S. at 328).

### i.   FUELS INFORMATION

Plaintiffs claim the government breached a mandatory duty by failing to obtain fuel levels from the Tatanka Station.   (Docket 33 at pp. 15-16).   In response, the government explains the burn boss attempted to collect fuel levels from the Tatanka Station but she was unable to obtain them.   (Dockets 40 at pp. 3-4 & 19 at p. 8).   The burn boss instead calculated on-site fuel conditions. (Docket 40 at pp. 3-4).   The government insists plaintiffs focus "on form over substance[]" because the burn boss' on-site calculations were probably more accurate than the Tatanka Station's.   Id.   The government argues the burn plan merely offers the Tatanka Station as a "minimum guideline" that the burn boss exceeded by collecting more accurate calculations.   Id. at p. 5.

11

As quoted earlier, the burn plan provides: "Fuels Information (forecast and observed) required and Procedures: National Fire Danger Rating System (NFDRS) indices from the Tatanka Prairie Remote Automated Weather Station (RAWS) will be used for current fuels information."   (Docket 18-6 at p. 14). With respect to collecting current fuel information, does this involve "an element of judgment or choice[?]"   Herden, 726 F.3d at 1046.   The court finds it does not.   Rather, the burn plan "clearly and specifically define[s] what the employees are supposed to do[:]" obtain fuels information from the Tatanka Station.   Compart's Boar Store, 829 F.3d at 605.   "While Defendant may have had discretion as to the analysis conducted within the Burn Plan, Defendant had no judgment or choice whether to complete a Plan and then *follow it once approved.*"   State of Fla. Dep't of Agric. & Consumer Servs. v. United States, No. 4:09-cv-386, 2010 WL 3469353, at *4 (N.D. Fla. Aug. 30, 2010) (emphasis added).

The government's point that the burn boss' on-site calculations may be more accurate amounts to arguing the government was not negligent because its fuels information was more helpful than what the burn plan required.   (Docket 40 at pp. 3-5).   The existence or absence of negligence has no place in this analysis.   "[N]egligence is simply irrelevant to the discretionary function inquiry . . . ."   Kennewick Irrigation, 880 F.2d at 1029; see Layton, 984 F.2d at 1502. The court is not convinced by the government's claim that the burn plan's provision lists Tatanka Station as a "minimum guideline."   (Docket 40 at p. 5).

12

For that to be true, the burn plan would need to state "the fuels information obtained must be at least as accurate as the Tatanka Station's information." Instead, the burn plan requires the Forest Service to "use[]" the Tatanka Station "for current fuels information."   (Docket 18-6 at p. 14).   The Forest Service did not do that.   (Docket 19 at p. 8).

By failing to abide by the burn plan, the Forest Service violated a mandatory policy.   See Compart's Boar Store, 829 F.3d at 605; State of Fla., 2010 WL 3469353, at *4.   Consequently, the discretionary function exception does not apply, the government is not immune from plaintiffs' suit on this issue and the court has subject matter jurisdiction.

### ii.   CHECKLIST

Plaintiffs allege the burn boss contradicted the Dakota Prairie Grasslands burn plan checklist when she indicated the burn unit had not "experienced unusual drought conditions [and did not] contain above normal fuel loadings which were not considered in the prescription development[.]"   (Docket 33 at pp. 18-21).   Plaintiffs view this part of the checklist as requiring the burn boss to "(1) [determine] what drought conditions actually existed when the prescription was developed; and then compare them with (2) the drought conditions on the day of the burn."   Id. at p. 19.   According to plaintiffs, the burn boss did not complete those two steps, which violates the burn plan.   Id. at pp. 19-21.

13

The government claims plaintiffs "read extra requirements into" the burn

plan.  (Docket 40 at p. 9).   The government asserts this portion of the checklist

simply "requires that the burn boss consider whether the burn unit has

experienced unusual drought conditions that were not considered in the

prescription development."   Id.   Contrary to plaintiffs' claim, the government

believes the checklist does not eliminate the burn boss' discretion.   Id.

The narrow issue here is whether the checklist imposes requirements

"clearly and specifically" directing how the burn boss must determine drought

conditions and fuel loadings.   See Compart's Boar Store, 829 F.3d at 605.   The

court finds it does not.

In Hardscrabble Ranch, L.L.C. v. United States, the United States Court of

Appeals for the Tenth Circuit addressed whether a checklist stripped the Forest

Service of discretion.   840 F.3d 1216, 1221-22 (10th Cir. 2016).   Hardscrabble

involved a fire ignited by lightning and the Forest Service's decision to partially

suppress the fire.   Id. at 1218.   In deciding what measures to take to suppress

the fire, the Forest Service had to complete a checklist that required it to consider

several questions.   Id. at 1218-19.   For instance, "[a]re potential effects on

cultural and natural resources outside the range of acceptable effects? [Yes/

No.]"   Id. at 1219.   The Tenth Circuit found "[t]he Checklist simply did not

remove [Forest Service] employees' choice or judgment regarding what measures

to take; it did not 'specifically prescribe[ ] a course of action for an employee to

follow.'"   Id. at 1221 (quoting Berkovitz v. United States, 486 U.S. 531, 536

14

(1988)).   This is because the Forest Service worked through "various considerations necessary in answering the questions posed by the Checklist[, which] are inherently discretionary."   Id.

In this case, the burn boss weighed "various considerations necessary in answering" whether unusual drought conditions existed.   Id.   When asked, "[d]id you determine whether there were unusual drought conditions that had not been considered in the prescription development?" the burn boss stated, "I considered it.   I didn't feel that drought conditions applied."   (Docket 32-3 at pp. 2-3).   The burn boss believed she could complete the checklist because the burn plan was developed under the "worst-case scenario where the fuels are dead and cured" and she used "one-hour fuel moistures" information.   Id. at pp. 4-7.

The checklist calls for the burn boss to weigh different considerations, which is "inherently discretionary."   Hardscrabble, 840 F.3d at 1221.   "This would remain true even if the [Forest Service] abused its discretion in its determination of [drought conditions and fuel levels.]"   Id.   Plaintiffs' "argument that a 'yes' answer was warranted to . . . the Checklist question[] is unavailing; at most, this would be an abuse of discretion to answer the question 'no.'   Yet that abuse is explicitly protected by the FTCA."   Id.; see also Kennewick Irrigation, 880 F.2d at 1029 (negligence is not relevant to discretionary function analysis); Layton, 984 F.2d at 1502 (same).

15

The court finds the government's conduct in completing the checklist involved discretion.

### iii.   HOLDING PLAN

#### 1.   JUSTIFICATION

The next instance of conduct plaintiffs target relates to the Forest Service's plan for containing the prescribed burn.   (Docket 33 at pp. 26-35).   Plaintiffs point out the prescribed fire guide requires the Forest Service to formulate a holding plan for the prescribed burn and to justify the equipment and personnel detailed in the plan.   Id. at p. 26.   In plaintiffs' view, the government's holding plan was insufficient, violating its mandatory duty to "justify minimum holding resources required."   Id. at p. 27.

The government asserts plaintiffs fail to identify a mandatory requirement in the prescribed fire guide on holding plans.   (Docket 40 at pp. 14-15).   The government explains the analysis it went through in creating the holding plan and claims how it "ultimately executed suppression efforts is irrelevant to [this] inquiry."   Id. at p. 19.

The prescribed fire guide does include mandatory requirements for the Forest Service's holding plan.   For example, as noted earlier, the holding plan "must be developed with the consideration of the predicted fire behavior outside the project boundary(s).   Fire behavior characteristics for fuel models within the maximum spotting distance and/or adjacent to the project boundaries must be considered and modeled.   These predictions must be modeled using fire

16

behavior model runs or empirical evidence of the hottest, driest, and windiest prescription limits identified in the Prescribed Fire Plan, along with the most extreme environmental conditions (slope, aspect) identified."   (Docket 18-5 at p. 22).

The government demonstrated it completed the modeling these provisions require.   (Docket 40 at p. 14) (citing testimony from Forest Service employees). In the burn plan, the Forest Service included "modeling runs that took into consideration the predicted fire behavior outside the project boundary. Appendix E of the Burn Plan includes the BehavePlus CONTAIN modeling runs as required by the Prescribed Fire Guide."   Id.   The burn plan's modeling runs also accounted for the "hottest, driest, and windiest prescription limits . . . ."   Id.

The prescribed fire guide directs the Forest Service to "justify" the resources it sets aside to control the prescribed burn.   (Docket 18-5 at p. 24). Whether the burn plan provides a justification is not discretionary and does not "involve an element of judgment or choice."   Compart's Boar Store, 829 F.3d at 604.   But plaintiffs challenge the *sufficiency* or *adequacy* of the Forest Service's holding plan.   Contrary to plaintiffs' argument, there is no mandatory requirement to provide a sufficient or adequate holding plan.   Plaintiffs claim that the government's holding plan was inadequate amounts to a negligence argument beyond the scope of this jurisdictional inquiry.   See Kennewick Irrigation, 880 F.2d at 1029; Layton, 984 F.2d at 1502.

17

The court finds the government's conduct in justifying its holding plan involved discretion.

### 2.   ENGINE STAFFING

The final instance of conduct plaintiffs challenge is the Forest Service's allocation of staff to fire engines.   (Docket 33 at pp. 32-35).   Plaintiffs argue the holding plan violated a Forest Service requirement regarding the number of people needed to staff fire engines.   Id.   Plaintiffs note the Forest Service regional manual provides:

> Type 6, type 4, and type 3 engines are approved for use in the Intermountain/Northern Regions. These engines, as a minimum, must have a tank capacity of 300 gallons, be equipped with an approved foam concentrate metering system, and be staffed by a 3-person effective crew, 7 days per week.

(Docket 31-1 at p. 2).   According to plaintiffs, the government violated this mandatory provision by assigning only two people to each type 6 engine. (Docket 32-6 at p. 2).

The government claims this "directive was not intended for prescribed fire operations or as a requirement to have no fewer than 3-persons to operate an engine."   (Docket 40 at p. 17 n.7).   According to the government, this provision establishes a "5-person module [ ] for at least 3-person staffing of the engine, 7 days/week, while allowing each person 2 days off per week[.]"   Id.   The government asserts "[i]t is not to be interpreted as a requirement that an engine must always respond with at least a 3-person crew as [the Forest Service] still

intend[s] to deploy the engine to a wildfire or prescribed fire with 2 people if a third is not available."   Id.

Whether to staff a type 6 engine with three or two people is a question the regional manual resolves without leaving the Forest Service discretion.   The regional manual deprives the Forest Service of "an[y] element of judgment or choice."   Compart's Boar Store, 829 F.3d at 604.   Either three people operate a type 6 engine consistent with the regional manual, or two people do, in violation of the provision.   (Docket 31-1 at p. 2).   The regional manual "clearly and specifically define[s] what the employees are supposed to do."   Compart's Boar Store, 829 F.3d at 605.   Whether, as the Forest Service states, it would "deploy the engine to a wildfire or prescribed fire with 2 people if a third is not available" has no effect on the mandatory nature of the engine staffing requirement. (Docket 40 at p. 17 n.7).   This statement simply indicates the extent to which the Forest Service intends to abide by the regional manual's mandate.   "While Defendant may have had discretion as to the analysis conducted within the Burn Plan," namely, which fire engines to use, "Defendant had no judgment or choice whether to complete a Plan and then *follow it once approved*."   State of Fla., 2010 WL 3469353, at *4 (emphasis added).

The government argues this three-person staffing requirement does not apply to the context of a prescribed burn.   (Docket 40 at p. 17 n.7).   The government asserts this provision covers how to staff an engine throughout a workweek, ensuring each person has two days off per week.   Id.   The regional

manual "[e]stablishes minimum standards for engine management in the . . . Northern Region[ ]."   (Docket 42-1 at p. 1).   The subsection on engine staffing is titled "Pumps and Engines" and is within a section on "Fire Management Equipment."   Id. at p. 2.   The general nature of this portion of the regional manual does not expressly limit itself to situations other than prescribed burns.

Because the government fails to demonstrate the regional manual's engine staffing requirement is inapplicable or non-mandatory, the court finds the conduct plaintiffs challenge on this issue did not involve discretion.   See Compart's Boar Store, 829 F.3d at 605; State of Fla., 2010 WL 3469353, at *4. As a result, the discretionary function exception does not apply, the government is not immune from plaintiffs' suit on this issue and the court has subject matter jurisdiction.

### b.   STEP TWO: ANY POLICY CONSIDERATIONS?

Step two of the court's analysis asks "whether the government employee's judgment or choice was 'based on considerations of social, economic, and political policy.' "   Herden, 726 F.3d at 1047 (quoting Layton, 984 F.2d at 1499). It does not matter "whether or not [a] defendant in fact engaged in conscious policy-balancing[,]" C.R.S., 11 F.3d at 801, as long as the "discretionary decision is 'susceptible to policy analysis . . . .' "   Herden, 726 F.3d at 1047 (quoting Gaubert, 499 U.S. at 325).

Because the court finds the Forest Service's actions regarding the Tatanka Station fuels information and type 6 fire engine staffing did not involve

20

discretion, the court does not proceed to step two for that conduct.   But the court does move to step two for the remaining challenged conduct—the checklist and holding plan justification.   At this stage of the inquiry, plaintiffs' bear the burden and must rebut the presumption that the government's discretionary conduct "involved considerations of public policy."   Compart's Boar Store, 829 F.3d at 605.

### i.  CHECKLIST

Plaintiffs assert the burn boss' actions in completing the checklist are not susceptible to policy considerations.   (Docket 33 at pp. 42-43).   Plaintiffs contend the checklist merely directed the Forest Service to "gather and use the required data under objective scientific principles."   Id. at p. 43.   The government argues all of its conduct at issue is part of the Forest Service's "over-arching objectives of reducing fuel loadings and decreasing wildfire size, intensity, and severity; keeping vegetation attributes intact and functioning within their historical range; and increasing livestock and wildlife forage quantity and quality as well as wildlife habitat."   (Docket 40 at p. 23).   According to the government, the burn boss balanced these policy goals in completing the checklist.   Id.

In arguing the burn boss incorrectly filled out the checklist indicating no unusual drought conditions or above normal fuel loadings, plaintiffs explain procedures they believe the burn boss should have carried out.   (Docket 33 at pp. 19-22).   For instance, plaintiffs claim the burn boss should have

21

investigated the precipitation levels from 2012 and 2013 to determine drought
conditions.   Id.

 As the Forest Service notes, the prescribed fire guide states a prescribed
burn is "one component of fire management" which is "used to alter, maintain, or
restore vegetative communities; achieve desired resource conditions; and to
protect life, property, and values that would be degraded and/or destroyed by
wildfire."   (Docket 18-5 at p. 4).   One specific goal is to use prescribed burns "in
a safe, carefully planned, and cost-efficient manner."   Id. at p. 7.

 In completing the checklist, the burn boss had to decide between using
information from the burn plan—the "worst-case scenario where the fuels are
dead and cured" and the "one-hour fuel moistures"—in contrast to gathering
new information as plaintiffs describe—the 2012 and 2013 precipitation levels.
(Docket 32-3 at pp. 4-7).   Put simply: use the information in hand or collect new
information.   This calls for the burn boss to balance the cost-efficiency of
expending resources to get new information against the Forest Service's duty to
use prescribed burns as a "component of fire management . . . ."   (Docket 18-5
at pp. 4, 7).   The burn boss had to consider whether the procedures plaintiffs
describe or the materials developed with the burn plan achieved the prescribed
fire guide's objectives for prescribed burns in protecting vegetative communities
and property.   Cf. Hardscrabble, 840 F.3d at 1222-23 (finding a checklist
involved balancing of "precisely the kind of social, economic, and political
concerns the discretionary function exception was designed to shield . . . .").

Whether the burn boss "in fact engaged in conscious policy-balancing" is not relevant.   C.R.S., 11 F.3d at 801.   The court finds plaintiffs failed to rebut the presumption that the Forest Service's discretionary conduct in completing the checklist is susceptible to policy considerations and shielded from "judicial second-guessing . . . ."   Herden, 726 F.3d at 1047.   The discretionary function exception applies.

### ii.   HOLDING PLAN: JUSTIFICATION

Plaintiffs argue the Forest Service's justification for its holding plan did not involve discretionary action susceptible to policy considerations.   (Docket 33 at pp. 41-42).   Plaintiffs claim the Forest Service's holding plan involved no policy balancing because it consisted of applying objective scientific principles to determine how to control the fire.   Id. at p. 44.   In response, the government argues "determining the ultimate number of resources to allocate to a prescribed burn [is] not judgment[] that require[s] only the performance of scientific evaluation . . . ."   (Docket 40 at p. 23).

As with the checklist, the court finds plaintiffs fail to rebut the presumption that the holding plan's justification could be subject to policy considerations.   See Compart's Boar Store, 829 F.3d at 605.   In developing a holding plan, the Forest Service had to detail the "general procedures to be used for operations to maintain the fire within the project area and meet project objectives until the fire is declared out."   (Docket 18-5 at p. 24).   This requires the Forest Service to balance its duty to carry out the prescribed burn in a

23

"cost-efficient manner" and its responsibility to apportion resources to control the fire.  Id. at pp. 7, 24.   The court will not second-guess this weighing of policies.

Because plaintiffs do not rebut the presumption that the Forest Service holding plan's justification involved policy considerations, the court finds the discretionary function exception applies.   See Herden, 726 F.3d at 1047.

**ORDER**

Based on the above analysis, it is

ORDERED that the government's motion to dismiss (Docket 16) is granted in part and denied in part.   The court has subject matter jurisdiction over plaintiffs' claim relating to the Tatanka Station fuels information and fire engine staffing.   The court lacks subject matter jurisdiction over plaintiffs' claims relating to the checklist and holding plan's justification.

Dated September 12, 2017.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE