UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| GRAND RIVER COOPERATIVE GRAZING ASSOCIATION,<br><br>        Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | CIV. 15-5087-JLV<br><br>ORDER |

**INTRODUCTION**

Grand River Cooperative Grazing Association is the last remaining plaintiff in this Federal Tort Claims Act case. Plaintiff brought this action alleging the United States Forest Service negligently allowed a prescribed burn on the Grand River National Grassland to become a wildfire, which consumed its privately owned lands. (Docket 1). Defendant, the United States, moved for summary judgment on the basis of an exculpatory clause in the grazing agreement between the parties. (Dockets 80 & 81). Plaintiff disputes the enforceability and applicability of the exculpatory clause. (Docket 94). Applying the plain, although broad, language of the clause, the court grants summary judgment to defendant.

**I.   Facts**

The facts of the underlying dispute are summarized in the court's order resolving defendant's motion to dismiss. (Docket 46 at pp. 2-6). The court

here limits itself to the facts necessary to resolve the pending summary judgment order.  The court views these facts in the light most favorable to plaintiff, the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

On February 26, 2013, the parties entered into a grazing agreement allowing plaintiff's members to graze cattle on portions of the Grand River National Grassland located in South Dakota's Perkins and Corson Counties. (Docket 83-1).  The agreement went into effect on March 1.  Id. at p. 1.  The agreement includes the following exculpatory clause:

> The Association shall hold the United States harmless from all loss, expense, liability, or other obligation of any nature arising out of any accident or occurrence causing injury to persons or property and due directly or indirectly to the use and management of the National Forest System lands and improvements.

Id. at p. 14.

Daniel Anderson, plaintiff's current president, participated in the negotiation of the agreement as the chairman of plaintiff's Records and Files Committee.  (Docket 107 at ¶¶ 1-4).  He alleges the Forest Service considered the exculpatory clause "not up for negotiation . . . for legal reasons[.]"  Id. at ¶ 5. Dennis Neitzke, then-Supervisor of the Dakota Prairie Grassland (which encompasses the Grand River National Grassland), also participated in the negotiations.  (Docket 103 at ¶¶ 1-2).  Mr. Neitzke does not recall any dispute over the exculpatory clause and notes the same clause was included in the prior grazing agreement.  Id. at ¶¶ 14-15.

On April 3, 2013, the Forest Service ignited a prescribed burn on grassland in Perkins County.  (Docket 95 at ¶ 6).  The Forest Service only intended to burn 203 acres.  Id. at ¶ 7.  However, the burn escaped the Forest Service's control and became a wildfire, later dubbed the Pautre Fire.  Id.; see also Docket 96-5 (Forest Service report on Pautre Fire).  The Pautre Fire eventually burned 10,679 acres.[1]  (Docket 96-5 at pp. 5-6).  At least 500 acres of plaintiff's privately-owned land burned.[2]  (Docket 95 at ¶ 8).

## II.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine

---

[1]The government asserts the fire burned 10,769 acres, which may be a typographical error.  (Docket 101 at ¶ 7).

[2]Plaintiff does not specify how much of its land was burned.  The government asserts the fire burned 534 acres of plaintiff's land.  (Docket 104 at ¶ 4).  The parties also dispute whether plaintiff's burned land was governed by the grazing agreement.  (Docket 101 at ¶ 5).  Exhibit C to the grazing agreement lists 21,745.23 acres by township and section associated with plaintiff that are covered by the agreement.  (Docket 83-1 at pp. 53-55).  A map included in the Forest Service's report shows plaintiff owned much of a section at Township 22N and Range 13E that burned.  (Docket 96-5 at p. 17).  The map does not include discernable section numbers.  However, Exhibit C lists 1,680.06 acres of plaintiff's land in Township 22N and Range 13N as covered by the grazing agreement.  (Docket 83-1 at p. 54).  Plaintiff did not develop any legal argument based on this factual dispute, so the court will not consider the matter further.

issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Only disputes over facts which might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at 248. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. Id. However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587-88 (1986). The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

4

### III. Analysis

Plaintiff offers three reasons why the grazing agreement's exculpatory clause does not control this case.   It asserts:

1. The clause contravenes South Dakota public policy and is unenforceable.   (Docket 94 at pp. 8-15).

2. The clause should not be construed to allow defendant to avoid responsibility for its own negligence.   Id. at pp. 16-17.

3. The clause does not cover the Forest Service's allegedly negligent acts in starting the Pautre Fire.   Id. at pp. 17-21.

The court concludes the clause is enforceable and governs this case.

### A.   South Dakota public policy

"To determine the extent of the government's liability under the FTCA, [a court] look[s] to state law[.]"   White v. United States, 959 F.3d 328, 332 (8th Cir. 2020).   The parties agree South Dakota law governs the construction of the exculpatory clause.   (Dockets 94 at p. 8 & 100 at p. 2).   In "interpret[ing] state law, [a court's] role is to follow the law as decided by that state's highest court. Absent clear direction from that court, [the court] must conduct [its] analysis as a predictive exercise, interpreting state law in the manner [it] believe[s] the state's highest court would rule."   Graham v. CIOX Health, LLC, 952 F.3d 972, 974 (8th Cir. 2020).   A release of liability "is a contract" and is interpreted accordingly.   Schaefer v. Sioux Spine & Sport, Prof. LLC, 906 N.W.2d 427, 431 (S.D. 2018).   "When the language of a contract is plain and unambiguous, it is [the court's] duty to interpret it and enforce it as written."   Edgar v. Mills, 892 N.W.2d 223, 231 (S.D. 2017) (internal citation omitted).

5

Contracts "contrary to an express provision of law or to the policy of express law . . . or otherwise contrary to good morals" are unlawful in South Dakota.  SDCL § 53-9-1.  "Public policy is found in the letter or purpose of a constitutional or statutory provision or scheme, or in a judicial decision."  Law Capital, Inc. v. Kettering, 836 N.W.2d 642, 645 (S.D. 2013) (internal quotation omitted).  The South Dakota Supreme Court "has cautioned ever since territorial days that the power of courts to declare a contract void for being in contravention of sound public policy, is a very delicate and undefined power; and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."  Domson, Inc. v. Kadrmas Lee & Jackson, Inc., 918 N.W.2d 396, 403 (S.D. 2018) (internal quotations and alterations omitted).

South Dakota has no general public policy against exculpatory clauses which immunize a party from liability for future negligence.  See Wimmer v. Top Gun Guide Service, Inc., 421 F. Supp. 3d 849, 855 (D.S.D. 2019) ("South Dakota case law has upheld the efficacy of broad waivers of liability."); Johnson v. Rapid City Softball Ass'n., 514 N.W.2d 693, 701 (S.D. 1994) ("[A]nticipatory releases are neither unusual nor per se void as a matter of public policy.") (internal quotation omitted) (Wuest, J., concurring).  Domson, a recent decision by the South Dakota Supreme Court, evinces the lack of South Dakota authority for the proposition that exculpatory clauses are *per se* void.  There, a contract between an engineer and a contractor contained an exculpatory clause immunizing the engineer from future liability for actions taken in good faith.  Domson, 918

6

N.W.2d at 399-400.  The court refused to hold the clause violated South Dakota public policy, "in light of [the contractor's] failure to identify a statutory provision or scheme or judicial decision . . . to support its argument that [the exculpatory clause] is unlawful."  Id. at 402-03.  It declined to establish a rule either against or in favor of exculpatory clauses.  Id. at 403.

The court can find no post-Domson authority establishing a South Dakota public policy against exculpatory clauses.  Plaintiff points to three cases as well as secondary authority, but none of these sources are binding or persuasive.

Plaintiff first relies on Justice Wuest's concurrence in Johnson.  (Docket 94 at pp. 9-11).  There, a softball player signed a team roster which purported to release the municipal ballfield owner of liability for injuries incurred during play.  514 N.W.2d at 695, 99.  The South Dakota Supreme Court, implicitly presuming the release was valid, reversed a grant of summary judgment for lack of evidence that the plaintiff consented to the release.  Id. at 697-98.  Two justices joined fully in the majority opinion.  Justice Wuest concurred in the majority opinion but, writing only for himself, felt public policy concerns "militate[d] against validating anticipatory exculpatory agreements[,]" especially where the release was part of a "take-it-or-leave-it" agreement.  Id. at 702-03.  He would have applied a six-factor balancing test borrowed from Washington jurisprudence.  Id. at 701-02 (citing Wagenblast v. Odessa Sch. Dist. No. 105-157-166J, 758 P.2d 968 (Wash. 1988)).  Plaintiff likewise urges this court to apply the Wagenblast test.  (Docket 94 at 9-11).

7

The problem with plaintiff's argument is that Justice Wuest's concurrence is not the law.  No other justice joined the concurrence.  The South Dakota Supreme Court has not chosen to adopt his skepticism of exculpatory clauses.  In fact, when presented with a similar issue in Domson, that court declined to apply any special legal analysis to the exculpatory clause.  918 N.W.2d at 403.  It was enough that the contractor failed to establish the clause "contravene[d] sound public policy in this State under these particular circumstances" and that the clause "unambiguously informed [the contractor] that [the engineer] would be immune from suit[.]"  Id.  Based on Domson, the court cannot conclude the South Dakota Supreme Court would apply the Wagenblast test or any other distinctive analysis.[3]

Plaintiff next points to two nonbinding federal cases for the proposition that exculpatory clauses are *per se* invalid or require special scrutiny.  (Docket 94 at pp. 8-9 & 11-13) (citing Lyndon Prop. Ins. Co. v. Duke Levy & Assocs., LLC, 475 F.3d 268 (5th Cir. 2007); Air Transport Assocs., Inc. v. United States, 221 F.2d 467 (9th Cir. 1955)).  Neither of these cases evaluated South Dakota law.

---

[3]The South Dakota Supreme Court also commented on exculpatory releases in Holzer v. Dakota Speedway, Inc., 610 N.W.2d 787 (S.D. 2000).  There, the court enforced an exculpatory clause related to the use of a motor vehicle racetrack.  Id. at 789-91, 93-95.  It noted "[s]ome courts have found exculpatory releases violate public policy when they involved a matter of interest to the public at large or the state" and identified "the employer-employee relationship, public service, public utilities, common carriers, and hospitals" as potential "matters of interest to the public at large or the state[.]"  Id. at 794 (internal quotations and citations omitted).  This dicta does not convince the court that South Dakota public policy requires invalidating the exculpatory clause at issue, especially in light of Domson.

Lyndon, 475 F.3d at 272 (Mississippi law); Air Transport, 221 F.2d at 472 (Washington law).   These cases say nothing about whether South Dakota disfavors exculpatory clauses.[4]   To the extent plaintiff seeks to persuade with these authorities, the court is unwilling to invalidate a contract without stronger indication from the South Dakota Supreme Court that public policy disfavors exculpatory clauses.   Domson, 918 N.W.2d at 403 (voiding contract for public policy reasons should be done "only in cases free from doubt.").

Finally, plaintiff cites secondary authorities.   It first looks to the Second Restatement of Contracts.   (Docket 94 at p. 9).   The Restatement holds an exculpatory clause "exempt[ing] one charged with a duty of public service from liability to one to whom that duty is owed" is unenforceable as against public policy.   Restatement (Second) of Contracts § 195 (1981).   However, the only South Dakota case cited in the Restatement's margin is Justice Wuest's concurrence in Johnson.   As noted above, the Johnson concurrence is insufficient on its own for this court to void the exculpatory clause, nor can the court predict the South Dakota Supreme Court would decline to enforce the clause.   It is for South Dakota courts to decide, in the first instance, if this Restatement should govern.

Plaintiff's reliance on Williston's treatise on contracts fails for similar reasons.   (Docket 94 at pp. 20-21).   It cites the treatise's summary that "clauses limiting future liability are strictly construed by the courts and are

---

[4]The South Dakota Supreme Court distinguished Lyndon in Domson. 918 N.W.2d at 402-03.

9

unenforceable unless assented to in a context of free and understanding negotiation." Id. at p. 20 (citing 8 Williston on Contracts § 19:21 (4th ed. May 2020)). In that same section, however, the treatise writes that "a contract for the future discharge of a claim *will be upheld according to its terms* unless it purports to immunize future conduct that is either intentionally tortious or grossly negligent, or unless it otherwise violates *a strong, well articulated, and clear public policy*." Williston at § 19:21 (emphasis added). Even assuming the proposition plaintiff cites should govern, South Dakota has no "strong, well articulated, and clear public policy" against exculpatory clauses. Id. In any event, the treatise cites no South Dakota cases nor has plaintiff otherwise established South Dakota law follows Williston in this regard.

Plaintiff next turns to the familiar maxim that an exculpatory clause purporting to release a party from its own gross negligence or intentional torts is invalid. (Docket 94 at pp. 13-15). This is undoubtedly the law in South Dakota. Holzer, 610 N.W.2d at 793 ("[R]eleases that are construed to cover willful negligence or intentional torts are not valid and are against public policy."). But plaintiff has never alleged defendant's conduct constituted gross

negligence or an intentional tort.[5]  Its complaint appears to allege only plain negligence and the court does not understand its summary judgment opposition to suggest otherwise.  (Docket 1 at ¶¶ 22-24).  Plaintiff cannot "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."  N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004); see also Lee v. Beauchene, 337 N.W.2d 827, 829 (S.D. 1983) (refusing to invalidate exculpatory release as violative of public policy where plaintiff did not plead any gross negligence or intentional tort).  To the extent plaintiff suggests the entire exculpatory clause should be struck because its broad language could cover gross negligence or intentional torts, the court will not void a contract with a hypothetically invalid application not presented by the facts of this case.

The court finds South Dakota public policy does not invalidate the grazing agreement's exculpatory clause.

**B.     Strict construction**

Plaintiff asks the court to narrowly construe the exculpatory clause. (Docket 94 at pp. 16-17).  It offers a host of out-of-state and secondary authority

---

[5]"In South Dakota, the phrases *gross negligence* and *willful or wanton misconduct* mean the same thing.  These phrases refer to a category of tort that is 'different in kind and characteristics' than negligence."  Fischer v. City of Sioux Falls, 919 N.W.2d 211, 215 (S.D. 2018) (internal citations omitted) (emphasis in original).  "Negligence involves an unreasonable risk of harm to another.  But for conduct to be willful or wanton, the risk involved must be substantially greater than that which is necessary to make the conduct negligent.  And the harm threatened must be an easily perceptible danger of death or substantial physical harm."  Id. (internal citations, quotations and alterations omitted).

11

for the proposition that courts should "substantially limit[] the efficacy of . . . exculpatory clauses[.]" Id. at p. 16. However, this section of plaintiff's brief does not cite a single South Dakota case—and for good reason, as South Dakota does not subscribe to a rule that exculpatory clauses should be strictly construed against the drafter. In fact, liability releases are generally valid "absent 'a legislative directive . . . that they are contrary to public policy.' " Holzer, 610 N.W.2d at 792 (quoting Lee, 337 N.W.2d at 828). The exculpatory clause at issue here is not contrary to South Dakota public policy. See supra Section III.A. There is no cause to narrow the clause.

Plaintiff does off-handedly assert defendant forced the exculpatory clause on it in "a take-it-or-leave it document[.]" (Docket 94 at p. 17). It did not develop any separate legal argument based on this allegation but instead argued it supported strictly construing the clause. Id. There is no South Dakota authority for plaintiff's requested strict construction of exculpatory clauses in particular, but there is a wealth of case law concerning the proper interpretation of adhesion contracts, defined in South Dakota as "one-sided agreements without a remedy for another party's breach." See Schwalm v. TCF Nat'l. Bank, 226 F. Supp. 3d 937, 943-44 (D.S.D. 2016) (canvassing South Dakota law on adhesion contracts). Plaintiff did not plead that the grazing agreement is an unconscionable adhesion contract, nor does it make such an argument in its summary judgment brief. The court therefore finds any argument on this basis waived.

12

### C. Applicability

Plaintiff's final argument is that the exculpatory clause is "simply inapplicable" to the alleged negligence at hand. (Docket 94 at p. 17). It asserts "none of the damage to the land . . . was due to the [the Forest Service's] 'management[.]' " Id. at p. 20. The Pautre Fire, plaintiff contends, "does not constitute a tool for management[.]" Id. at p. 18. The court cannot endorse this cramped reading of the clause.

The clause exempts defendant "from all loss [or] liability . . . arising out of any accident or occurrence causing injury to . . . property and due directly or indirectly to the use and management of the National Forest System lands[.]" (Docket 83-1 at p. 14). Plaintiff concedes a prescribed grassland burn is proper land management. (Docket 94 at pp. 18-19). The prescribed burn caused plaintiff's losses when it escaped containment and became a wildfire, which it does not dispute. Under an ordinary reading of the clause, then, loss caused by a wildfire accidently begun in the course of a prescribed burn would clearly be "due directly or indirectly to the use and management" of the grassland. (Docket 83-1 at p. 14).

Plaintiff resists this straightforward conclusion. It first asserts a wildfire is not a management tool and is therefore not within the clause's ambit. (Docket 94 at pp. 18-20). But the clause does not require the harm be a management tool—the harm must be an "accident or occurrence . . . due directly or indirectly to the use and management" of the grassland. (Docket 83-1 at

13

p. 14). This language contemplates harm caused by non-intentional incidents connected to the use or management of the grassland. A wildfire originating in a botched prescribed burn is self-evidently an accident caused by use or management of the grassland. Plaintiff's contrary interpretation cannot comport with the clause's plain language.

Plaintiff next argues its losses were due to the Forest Service's alleged failure to properly staff fire engines for suppressing the escaped fire. (Docket 94 at p. 21). It asserts "[t]he staffing of fire engines is not an activity that constitutes management" of the grassland. Id. The court will assume plaintiff's loss can be said to stem separately from understaffing as opposed to the underlying wildfire. Even so, the broad language of the clause is dispositive. The clause immunizes defendant from loss "arising out of any . . . occurrence . . . due directly *or indirectly* to the use and management" of the grassland. (Docket 83-1 at p. 14) (emphasis added). Fire engine staffing is necessary when proper land management involves the use of fire in a grassland for the exact reason shown by this case: a prescribed burn can escape control and become a wildfire. If the Forest Service was not managing the grassland with a prescribed burn, it would have had no reason to staff fire engines on the day of the burn. The Forest Service's alleged understaffing is thus due indirectly—if not directly—to its management of the grassland via a prescribed burn.

The court finds the exculpatory clause's broad language clearly encompasses the harm at issue in this case.

### IV. Conclusion

The court concludes the grazing agreement's exculpatory clause is enforceable and applies to losses caused by the Pautre Fire. Were this court applying the law of another state, the outcome could well be different. Plaintiff convincingly showed many states regard exculpatory clauses with far more skepticism than does South Dakota, perhaps for good reason. In South Dakota, however, parties may contract themselves out of liability for future negligence with little oversight from the courts. The parties agreed to exactly that outcome in this case. Summary judgment is granted to defendant.

### ORDER

For the reasons given above, it is

ORDERED that defendant's motion for summary judgment (Docket 80) is granted.

Dated June 30, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE